CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

APR 2 7 2009

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **Criminal No. 7:07CR00079** |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| JODY ALTON SMITH, SR., | ) | By: **Hon. James C. Turk** |
| MARGARET SMITH. | ) | **Senior United States District Judge** |

This matter is before the court on defendant Jody Alton Smith, Sr.'s and defendant Margaret Smith's separate motions for judgment of acquittal and for a new trial. Both defendants were convicted by a jury on numerous charges that sprang from the government's investigation into an illegal moonshine operation. In addition to convictions directly related to the production of illegal liquor, the defendants were also convicted of money laundering and perjury charges, and in the case of Jody Smith, fraudulent receipt of social security disability funds. The United States filed a brief in opposition and the court heard argument on the motions, making the matters ripe for disposition. Upon review of the parties' briefs and the record of the case, the court finds that the defendants' motions must be granted in part and denied in part.

## I. Background and Procedural History

On March 13, 2008, Jody Smith, Margaret Smith, and other co-defendants were indicted by a federal grand jury in a 33-count Superseding Indictment ("Indictment").[1] (Dkt. No. 104.) The court severed Counts 31 and 32 (charging Jody Smith with obstruction of justice and witness tampering), and a trial began on September 8, 2008 against Jody Smith and Margaret Smith on all remaining counts. A jury returned a guilty verdict on all 30 tried counts on September 17,

---

[1] All of the other co-defendants entered guilty pleas.

1

2008.[2]

For ease of reference, the court will group the convictions into four categories: (1) the illegal moonshine operation (Counts 1-11); (2) social security disability fraud (Count 12); (3) money laundering (Counts 13-28); and (4) perjury (Counts 29-30). With the exception of Count 30, Jody Smith was charged on all counts and subsequently convicted of all charges. (See Jody Smith Verdict, Dkt. No. 216.) Margaret Smith was charged and convicted on Counts 1, 13, 16, 19, 22-28, and 30. (See Margaret Smith Verdict, Dkt. No. 217.)

At the close of the government's evidence, both defendants made motions for judgment of acquittal as to all counts. (See Sep. 15, 2008 Criminal Minutes, Dkt. No. 207.) The court denied the motions as to the moonshine operation, social security disability fraud, and perjury counts, but took the motions under advisement with respect to the money laundering counts. (See id.) After all evidence was submitted, the defendants renewed their motions for judgment of acquittal, which the court denied, except that the court again took the motions under advisement with respect to the money laundering counts. (See id.)

After trial, both defendants again renewed their motions for judgment of acquittal as to all counts, and submitted briefs in support. (See Dkt. Nos. 229-30, 234). In addition, both defendants moved in the alternative for a new trial. (See Dkt. Nos. 228, 230, 234). The government opposed the motions in a consolidated brief (Dkt. No. 246), and the court heard oral argument on April 7, 2009.

---

[2] In addition, the Indictment included a forfeiture charge (Count 33). After returning its verdict, the jury then found by a preponderance of the evidence that property implicated by the moonshine operation and social security fraud was subject to forfeiture to the United States. (See Special Verdict, Dkt. No. 221.) This forfeiture is not directly challenged by the defendants' post-trial motions and in any event is not disturbed by the court's rulings contained herein.

## II. Standards of Review

Convictions must be sustained if, viewed in the light most favorable to the government, there is substantial evidence to support them. See Glasser v. United States, 315 U.S. 60, 80 (1942), superseded by statute on other grounds, Bourjaily v. United States, 483 U.S. 171, 176-78 (1987); Fed. R. Crim. P. 29(a). In the context of a criminal action, the Fourth Circuit has defined substantial evidence as "that evidence which 'a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.'" United States v. Newsome, 322 F.3d 328, 333 (4th Cir. 2003) (quoting United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996)). In a sufficiency determination, a court "must consider circumstantial as well as direct evidence, and allow the government the benefit of all reasonable inferences from the facts proven to those sought to be established." United States v. Tresvant, 677 F.2d 1018, 1021 (1982) (citations omitted). When evaluating the sufficiency of the evidence, the court does not review the credibility of the witnesses, but assumes that the jury resolved all contradictions in the testimony in favor of the government. See United States v. Romer, 148 F.3d 359, 364 (4th Cir. 1998). In contrast, when a motion for judgment of acquittal is premised upon legal error, the court reviews the claimed errors of law de novo. United States v. Hutcherson, No. 6:05cr00039, 2006 WL 1875955, at *1 (W.D. Va. July 5, 2006). See also United States v. Shelbourne, 563 F. Supp. 2d 601, 605-07 (W.D. Va. 2008) (granting motion for judgment of acquittal in part based upon legal error).

With respect to motions for a new trial, a court may vacate any judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Insufficient evidence may also form the basis for a motion for a new trial, but "a court should exercise its discretion to grant a new trial sparingly, and . . . it should do so only when the evidence weighs heavily against the

3

verdict." United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003) (internal quotations omitted). When considering a motion for a new trial based on the sufficiency of the evidence, a "court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of the witnesses." United States v. Arrington, 757 F.2d 1484, 1485 (4th Cir. 1985).

"If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1). In any conditional ruling on a motion for new trial, the court must also "specify the reasons for that determination." Id. If the court conditionally grants a motion for a new trial, this "does not affect the finality of the judgment of acquittal." Fed. R. Crim. P. 29(d)(2).

### III. Analysis—Margaret Smith

### A. Moonshine Operation

Of the 11 moonshine counts in the Indictment, Margaret Smith was charged only in Count 1—conspiracy to (1) violate the Travel Act through the unlawful liquor operation (in violation of 18 U.S.C. § 1952(a)(3) and 26 U.S.C. §§ 5001, 5006, & 5601(a)) and to (2) produce and receive untaxed liquor (in violation of 26 U.S.C. § 5601(a)). Margaret Smith argues that the court should set aside this conviction due to the insufficiency of evidence. In the alternative, she argues that the interests of justice require a new trial due to insufficient evidence, and also that a new trial is warranted because of the prejudicial effect of not giving her requested money laundering jury instructions.

As previously stated on the record when denying Margaret Smith's motion for judgment of acquittal as to the moonshine conspiracy charge, the court finds that the government's

4

evidence was sufficient to sustain the jury's verdict. The evidence clearly established the existence of an unregistered, unbonded still on the Halifax property. Agents could smell the distillery while it was producing liquor. The government introduced records pertaining to the purchase of sugar, the primary raw ingredient for the production of moonshine. When the property was searched, the necessary elements needed to make and distribute liquor were discovered, as well as liquor itself and residue of fermented mash. In addition, one customer observed on surveillance tapes, John Taylor, testified about his purchase of liquor. Finally, co-defendant Jarman Johnson testified about his involvement in the moonshine conspiracy, and the government also introduced a tape provided by Johnson where Jody Smith and other co-defendants discussed elements of the conspiracy.

Margaret Smith's involvement in the moonshine conspiracy was admittedly not as direct as other co-defendants—there was no evidence that she was involved in the actual production of liquor or even that she had ever set foot on the Halifax property. Still, by placing title of the Halifax property in her name and making its mortgage payments, Margaret Smith played a vital role in the conspiracy, in particular helping to conceal the moonshine operation from law enforcement authorities.[3] In addition, Margaret Smith's false and misleading statements to law enforcement agents and before the grand jury (which also led to Margaret's perjury conviction) evidence her knowledge of the unlawful moonshine conspiracy. In short, the government's evidence of Margaret Smith's involvement in the moonshine conspiracy was overwhelming and certainly sufficient for a reasonable jury to have found her guilty as to Count 1.

In addition, there is no merit to the argument that the jury's consideration of the moonshine conspiracy count was somehow prejudiced by the court's instructions as to the

---

[3] The evidence also showed that Margaret Smith paid electrical bills for the Halifax property, even before title was placed in her name.

separate money laundering counts. As explained above, the evidence of Margaret Smith's involvement in the moonshine conspiracy was substantial.

For the reasons stated, the court will deny Margaret Smith's motions for judgment of acquittal and a new trial as to Count 1.

### B. Money Laundering

Margaret Smith was convicted of conspiring to launder money (Count 13) as well as nine individual violations of the money laundering statute (Counts 16, 19, 22-28). The individual violations were the transfer of title to the Halifax property from co-defendant Danny Davis to Margaret Smith (Count 16), and her subsequent payments towards the Halifax property mortgage (Counts 19, 22-28).

In her renewed motion for judgment of acquittal, Margaret Smith argues that all the individual money laundering violations were payment of the moonshine operation's essential expenses, which as a matter of law cannot constitute "proceeds" under 18 U.S.C. § 1956 after the Supreme Court's recent decision in United States v. Santos, 128 S. Ct. 2020 (2008). Relatedly, Margaret Smith argues that the court erred in refusing her requested jury instruction that "proceeds" means "profits," not "receipts," in light of Santos. She also contends that the government introduced no evidence that she had knowledge that Jody Smith was receiving any fraudulent social security disability payments. Finally, Margaret Smith argues that her money laundering convictions should be vacated because the government failed to prove beyond a reasonable doubt that the mortgage payments were made using proceeds from either the illegal moonshine business or from Jody Smith's fraudulent social security disability payments. In the alternative, she claims that a new trial is warranted on the money laundering counts because of insufficient evidence and the prejudicial effect not giving her requested money laundering jury

instruction.

The relevant provisions of the money laundering statute read as follows:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or
> ...
> (B) knowing that the transaction is designed in whole or in part—
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity

18 U.S.C. § 1956(a)(1).

The crimes that may constitute a "specified unlawful activity" are defined by statute and include both underlying moonshine violations (18 U.S.C. § 1952—Travel Act) and fraudulent receipt of social security disability payments (18 U.S.C § 641—theft of public money). See 18 U.S.C. § 1956(c)(7). The Indictment charged that the defendants violated the money laundering statute by both intending to "promote" the moonshine operation and to "conceal and disguise" the proceeds of the moonshine operation. More specifically, the Indictment charged that Margaret Smith and other defendants conducted financial transactions which

> involved the proceeds of a specified unlawful activity (to wit: (1) proceeds [from the illegal moonshine operation] and (2) proceeds from the receipt of fraudulent [social security disability benefits]), knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source and ownership of the proceeds of specified unlawful activity (1), and with the intent to promote the carrying on of said specified unlawful activity (1), and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity.

(Indictment at 14-15.)

7

Santos was a plurality decision that affirmed the reversal of the "promotion" money laundering convictions of defendant Santos, who had run an illegal lottery business in bars and restaurants in Indiana. 128 S. Ct. at 2022-23. The financial transactions at issue were Santos' payments to employees and winners out of the receipts from the lottery ticket sales. Id. Four justices affirmed the reversal of Santos' convictions by holding that "proceeds" (undefined by the money laundering statute) means "profits" rather than "receipts," regardless of what predicate crime is the "specified unlawful activity" in a particular case. This determination was based principally on the rule of lenity, which courts should apply when construing ambiguous criminal laws.

In addition, the plurality was troubled by the "strange consequence" of the "receipts" interpretation:

> nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the lottery. Since few lotteries, if any, will not pay their winners, the statute criminalizing illegal lotteries, 18 U.S.C. § 1955, would "merge" with the money-laundering statute. Congress evidently decided that lottery operators ordinarily deserve up to 5 years of imprisonment, § 1955(a), but as a result of merger they would face an additional 20 years, § 1956(a)(1). Prosecutors, of course, would acquire the discretion to charge the lesser lottery offense, the greater money-laundering offense, or both— which would predictably be used to induce a plea bargain to the lesser charge.

Id. at 2026. As the plurality explained, the "merger problem" is not limited to illegal lotteries, but applies to "a host of predicate crimes," as "[f]ew crimes are entirely free of cost. . . . Generally speaking, any specified unlawful activity, an episode of which includes transactions which are not elements of the offense and in which a participant passes receipts on to someone else, would merge with money laundering." Id. at 2026-27.

Justice Stevens provided the fifth vote in favor of affirming Santos' judgment. Justice

Case 7:07-cr-00079-JCT   Document 338   Filed 04/27/09   Page 8 of 29   Pageid#: 2646

Stevens parted from the plurality because he believes that the term "proceeds" could be defined differently for different predicate crimes, and that courts' interpretation should generally be guided by the legislative history of the money laundering statute. Finding the legislative history silent on the meaning of "proceeds" for a stand-alone gambling venture,[4] Justice Stevens concurred with the plurality's judgment because the consequences of using a "receipts" definition were "so perverse," due to the aforementioned merger problem:

> Allowing the Government to treat the mere payment of the expense of operating an illegal gambling business as a separate offense is in practical effect tantamount to double jeopardy, which is particularly unfair in this case because the penalties for money laundering are substantially more severe than those for the underlying offense of operating a gambling business.

Id. at 2033. Stated succinctly, Justice Stevens held that "[t]he revenue generated by a gambling business that is used to pay the essential expenses of operating that business is not 'proceeds' within the meaning of the money laundering statute." Id. According to Justice Stevens, "[t]his conclusion dovetails with what common sense and the rule of lenity would require." Id.

While both the plurality and Justice Stevens acknowledged that the stare decisis effect of Santos is limited by Justice Stevens' concurrence, there was no agreement as to what was that precedential effect.[5] In such situations, "the holding of the Court may be viewed as that position

---

[4] Though not directly citing legislative history in support, Justice Stevens stated that "it is clear that Congress intended the term 'proceeds' to include gross revenues from the sale of contraband and the operation of organized crime syndicates involving such sales." Santos, 128 S. Ct. at 2032. Thus, together with the four dissenters, there are five votes that "proceeds" means "receipts" for these predicate crimes, which are "most of the cases that were the focus of congressional concern when the money laundering statute was enacted." Id. at 2035-36 & n.1 (Alito, J., dissenting).

[5] The plurality opinion states that the "narrowness" of Santos's stare decisis effect:

> consists of finding that "proceeds" means "profits" when there is no legislative history to the contrary. That is all that our judgment holds. It does not hold that the outcome is different when contrary

taken by those Members who concurred in the judgment[] on the narrowest grounds." <u>Marks v.</u>

<u>United States</u>, 430 U.S. 188, 193 (1977) (quotation omitted). As recognized by the United States

here, this "means that Justice Stevens' concurring opinion is the one that controls." (Gov. Opp.

Br. at 33, Dkt. No. 246.)

As an initial position, the government argues that <u>Santos</u> should be limited to its facts,

and that the controlling holding is simply that "the receipts rule does not apply to at least some

money laundering cases involving gambling proceeds." (<u>Id.</u>) In all other cases (with the

exception of laundering proceeds from the sale of contraband), "pre-<u>Santos</u> case law defining

proceeds in a given circuit continues to apply." (<u>Id.</u> at 34.)[6] The government then shifts course

and devotes the remainder of its brief on this point to arguing that even under Stevens' "essential

expense" analysis, the money laundering convictions should still stand. (<u>Id.</u> at 34-40.)

---

> legislative history does exist. Justice Stevens' speculations on that
> point address a case that is not before him, are the purest of dicta,
> and form no part of today's holding.

<u>Santos</u>, 128 S. Ct. at 2031. However, Justice Stevens in turn describes this statement as the "purest of dicta," and states that his conclusion rests on a "conviction that Congress could not have intended the perverse result" of defining "proceeds" to mean "receipts" in the operation of an illegal gambling business. <u>Id.</u> at 2034 n. 7.

[6] After briefing in this case, the Fourth Circuit issued a decision which appears to supports the government's above interpretation. <u>See</u> <u>United States v. Howard</u>, No. 07-4146, 07-4147, 07-4168, 2009 WL 205649, at *10 (4th Cir. Jan. 29, 2009) (per curiam) ("Because <u>Santos</u> does not establish a binding precedent that the term 'proceeds' means 'profits,' except regarding an illegal gambling charge, we are bound by this Court's precedent establishing that 'proceeds' means 'receipts.'" ). However, the court declines to follow <u>Howard</u> for the following reasons. First, <u>Howard</u> is an unpublished per curiam opinion and not binding precedent on this court. Second, the facts in <u>Howard</u> did not present the "perverse result" that motivated Justice Stevens in <u>Santos</u> (and that also exist here). Promotion of prostitution was the predicate crime in <u>Howard</u>, including violations of 18 U.S.C. §§ 2422(a) (coercion and enticement) & 2423(a) (transportation of minors). (<u>See</u> <u>Howard</u> Superseding Indictment, 3:04cr00271, Dkt. No. 88.) These crimes carried statutory maximums that were equal to or greater than the 20-year maximum for money laundering. Third, in <u>Howard</u> the Fourth Circuit was applying a "plain error" review. 2009 WL 205649, at *9.

The court believes that <u>Santos</u> stands for the proposition that, as a matter of law, the revenue generated by a specified unlawful activity used in a financial transaction to pay the essential expenses of operating that same illegal business cannot constitute "proceeds" under the money laundering statute, if the penalties for money laundering are substantially more severe than those for the underlying specified unlawful activity. <u>See</u> <u>Santos</u>, 128 S. Ct. at 2033 (Stevens, J. concurring). While the plurality sought to implement a broader rule that "proceeds" means "profits" in all applications of the money laundering statute, there are five votes in favor of this narrower proposition. Here, as in <u>Santos</u>, it would be a "perverse result" if revenue from the illegal moonshine business used to pay its essential expenses could constitute a money laundering violation. The maximum statutory penalty for any underlying moonshine violation charged in this case is five years (<u>see</u> 18 U.S.C. §§ 371, 1952(a)(3)(A); 26 U.S.C. § 5601(a)), while the statutory maximum for money laundering is 20 years (<u>see</u> 18 U.S.C. § 1956(a)(1)). Accordingly, to the extent that the money laundering counts charge use of moonshine revenues to simply pay the costs involved with operating that illegal business (i.e. the mortgage payments), Margaret Smith's convictions cannot be sustained.

The court will next address the government's remaining arguments with respect to Margaret Smith's money laundering convictions. First, the government contends that the determinate of whether there is a "merger problem" hinges on whether "the money laundering transaction constitutes the payment of an essential expense of an <u>already</u> <u>completed</u> crime." (Gov. Opp. Br. at 36 (emphasis added).) The court finds this argument unavailing, as the case the government chiefly relies upon, <u>United States v. Singh</u>, 518 F.3d 236 (4th Cir. 2008), was decided prior to <u>Santos</u>, and Justice Stevens' opinion does not indicate support for such a temporal distinction. <u>Santos</u>, 128 S. Ct. 2033 ("The revenue generated by a gambling <u>business</u>

11

that is used to pay the essential expenses of <u>operating that business</u> is not 'proceeds' within the meaning of the money laundering statute.") (emphasis added). Further, this court previously rejected essentially the same argument in the <u>Shelbourne</u> case. There, the defendant dentist was convicted "of crimes related to a scheme to defraud Medicaid," including seven counts of money laundering. <u>Shelbourne</u>, 563 F. Supp. 2d at 602. As in this case, the government argued that there was only a "merger problem" under <u>Santos</u> if payments were for an "essential expense of an already completed crime." <u>Id.</u> at 607 (quoting government's brief). The court rejected this argument in <u>Shelbourne</u>, and vacated the five money laundering counts that represented "payments for building and equipment rent and dental supplies." <u>Id.</u>[7] The court finds similarly in the instant case, and thus rejects the government's argument that the merger problem only exists if criminal proceeds are used to pay essential expenses for discrete and completed crimes.

Second, the government argues that the transaction represented by Count 16 (transfer of the Halifax property title from Danny Davis to Margaret Smith) was not a "necessary expense" for the moonshine business." (Gov. Opp. Br. at 37.) Even assuming that this proposition is correct, the court finds that Margaret Smith's conviction for Count 16 should be vacated because the transaction at issue did not "involve the proceeds" of the illegal moonshine operation, regardless of how one defines "proceeds." The first charged overt act of the moonshine conspiracy was Danny Davis' purchase of the Halifax still property in January 2003, a purchase that could not have been made with money from the sale of illegal liquor.[8] Thus, transferring

---

[7] The remaining two money laundering convictions represented salary payments that the defendant had made to himself and were vacated on other grounds. <u>Shelbourne</u>, 563 F. Supp. 2d at 607-08.

[8] Similarly, the January 2003 purchase could not have been made with fraudulent social security money, as the evidence at trial was that Jody Smith's fraudulent receipt of social security disability payments began in 2004. (<u>See</u> Gov Opp. Br. at 6-10 & Ex. C (summarizing financial evidence related to social security disability fraud).)

12

title to the same Halifax property two years later cannot be a transaction that involves the proceeds of moonshining.

Third, the government claims that because it charged that the § 1956(a)(1) "proceeds of specified unlawful activity" could be either from the moonshine operation or from Jody Smith's fraudulent receipt of social security disability payments, Margaret Smith's money laundering convictions are proper even under Stevens' "essential expense" analysis. The government reasons that the money laundering transactions "involved co-mingled funds, including the proceeds from social security fraud, which were pure profit." (Gov. Opp. at 38.) Though the court ultimately finds this argument unavailing for reasons expressed when discussing Jody Smith's money laundering convictions (<u>see</u> <u>infra</u> Part IV(E)), with respect to Margaret Smith the argument fails in a more fundamental respect: there was absolutely no evidence that Margaret Smith knew that Jody Smith was obtaining fraudulent social security disability payments. All of the government's evidence as to the social security fraud was limited to Jody Smith, in particular the notice that he received of his reporting requirements and failure to report any relevant changes in his situation. Therefore, even assuming that use of fraudulent social security disability payments to promote the moonshine operation could otherwise independently support Margaret Smith's money laundering convictions, the government failed to prove the essential element of her knowledge that Jody Smith had illegally received social security disability funds. <u>See</u> 18 U.S.C. § 1956(a)(1) ("Whoever <u>knowing</u> that the property involved in a financial transaction represents the proceeds of some form of unlawful activity . . . .") (emphasis added); <u>United States v. Medina</u>, 485 F.3d 1291, 1300-01 (11th Cir. 2007) ("[S]ince no evidence exists in the record to establish that [defendants] were aware of the health care fraud, we must vacate their convictions for conspiracy to commit money laundering, as well as all the substantive

money laundering counts.").

Fourth, the government argues that <u>Santos</u> should be limited to money laundering transactions that "promote" the specified unlawful activity. Because the government charged both "promote" and "conceal and disguise" violations, it contends that <u>Santos</u> should not disturb the government's alternative rationale for the money laundering convictions. Under the government's argument then, "proceeds" could have different meanings within the money laundering statute, and within a single count of an Indictment. <u>Compare</u> 18 U.S.C. § 1956(a)(1) <u>with</u> 18 U.S.C. § 1956(a)(1)(A)(ii). The court finds that such a construction would violate the "presumption that identical words used in different parts of the same act are intended to have the same meaning," as in this case there is no reason to "conclu[de] that ['proceeds' was] employed in different parts of the [money laundering statute] with different intent." <u>Atlantic Cleaners & Dyers v. United States</u>, 286 U.S. 433 (1932). Again, the court holds that revenue generated by a specified unlawful activity used in a financial transaction to pay the essential expenses of operating that same illegal business cannot constitute "proceeds" under the money laundering statute, if the penalties for money laundering are substantially more severe than those for the underlying specified unlawful activity.

Finally, the government argues that <u>Santos</u> should not apply to the conspiracy to launder money conviction (Count 13). The court finds that if the transactions that form the basis for Margaret Smith's conspiracy conviction are no longer valid after <u>Santos</u>, then so too must her conspiracy conviction be vacated. <u>See</u> <u>Santos</u>, 128 S. Ct. at 2023, 2031 (affirming Seventh Circuit's decision to vacate all money laundering convictions, including conspiracy to launder money).

Alternatively, and irrespective of <u>Santos</u>, the court finds that Margaret Smith's money

14

laundering convictions for payments towards the Halifax property's mortgage must be overturned because there was insufficient evidence that the funds used for those payments represented proceeds from either the illegal moonshine operation or Jody Smith's fraudulent social security disability payments. Margaret Smith's involvement with the moonshine conspiracy was chiefly placing the Halifax property in her name and then making the mortgage payments. She was never placed at the scene of the moonshine production. There was no evidence that she ever had contact with any purchaser of illegal liquor. In short, there was no evidence that Jody Smith or any other co-defendant ever gave Margaret Smith any money from the sale of illegal liquor. Likewise, there was no evidence that Jody Smith ever gave Margaret Smith any funds from his receipt of fraudulent social security disability benefits. To the contrary, the evidence was that Margaret Smith continued to make the mortgage payments on the Halifax property even after its May 2006 search. Though Margaret Smith's bank records indicated the presence of some unexplained cash deposits, a reasonable jury could not infer from this that she was receiving proceeds from either the moonshine operation or social security disability fraud and then used any of these funds to make the mortgage payments, despite any relationship she had with Jody Smith. See United States v. Baker, 985 F.2d 1248, 1254 (4th Cir. 1993) (despite a relationship with the purchaser of a boat (the transaction at issue), the Fourth Circuit vacated defendant's money laundering conviction, in part, because "none of the evidence identified the source of the money" used to buy the boat, and to not overturn the verdict would be "to condone conviction through raw speculation").

Pursuant to Fed. R. Crim. P. 29(d)(1), the court also conditionally grants Margaret Smith's motion for a new trial on the money laundering counts. First, as explained supra, the court finds that Count 16 fails as a matter of law. Second, the court finds that the evidence was

15

insufficient for a reasonable jury to find that that the funds Margaret Smith used for mortgage payments represented proceeds from either the illegal moonshine operation or Jody Smith's fraudulent social security disability payments. Third, in light of <u>Santos</u>, the court finds that the money laundering jury instructions were prejudicial. The jury should have been instructed that the revenue generated by a specified unlawful activity used in a financial transaction to pay the essential expenses of operating that same illegal business cannot constitute "proceeds" under the money laundering statute.

For the reasons stated, the court will grant Margaret Smith's motion for judgment of acquittal as to Counts 13, 16, 19, and 22-28, and conditionally grant Margaret Smith's motion for a new trial on these same counts.

## C. Perjury

Margaret Smith was charged and convicted of perjury for statements she made before the grand jury concerning the rental of the Halifax property to a J.B. Jones, and her use of cash from this J.B. Jones to make the property's mortgage payments (Count 30). Margaret argues that the court should set aside this conviction, or in the alternative grant a new trial, because of insufficient evidence. More specifically, Margaret contends that the trial testimony of Jesse Beck—a government witness who testified that someone matching Margaret's description of J.B. Jones repeatedly purchased and picked up sugar in 2005-06 from Beck's former employer, William R. Hill & Company—confirms that Margaret did not commit perjury in her grand jury testimony.[9]

---

[9] Before the grand jury, Margaret Smith described J.B. Jones as physically resembling "Uncle Jesse" from the Dukes of Hazard—white beard, bib overalls, and wearing a baseball cap. Similarly, Beck testified (unprompted) that one purchaser of sugar stood out to him, a man who "looked like Uncle Jesse off the Dukes of Hazard." (Sep. 10, 2008 Tr. Transcript at 42, Dkt. No. 304.)

16

The court finds that sufficient evidence supports Margaret Smith's perjury conviction, regardless of whether J.B. Jones (or a man who called himself J.B. Jones) exists. The evidence at trial supports the jury's judgment that Margaret made material false statements before the grand jury, and that no actual rental of the Halifax property ever occurred. The rental agreement that Margaret presented before the grand jury was materially different than one that the government found during its search of Jody Smith's business, Smith's Auto Sales. Margaret Smith's bank records do not show her claimed pattern of deposits. She did not claim any rental income on her 2005 taxes until after the government's investigation had begun, through an amended return filed in 2007. Further, discrepancies between the rental deductions claimed on the amended return and the evidence adduced at trial support the jury's conclusion that there was no actual rental of the Halifax property.

For the reasons stated, the court will deny Margaret Smith's motions for judgment of acquittal and for new trial as to Count 30.

## IV. Analysis—Jody Smith

As stated previously, Jody Smith was charged and convicted of 29 counts of the Indictment: Counts 1-11 (illegal moonshine operation), Count 12 (social security fraud), Counts 13-28 (money laundering), and Count 29 (perjury). Because Jody Smith's arguments could apply to multiple types of conviction categories, the court will parallel its analysis to Jody Smith's briefing of legal issues.

### A. Search of the Locked Trailer—Fourth Amendment

On March 1, 2006, Agent Jay Calhoun entered property belonging to Jody Smith without a warrant. While on this property in Pittsylvania County, Agent Calhoun approached a locked, unhitched trailer in the middle of an open field. This field was surrounded by woods and not

near a residence of any type. In fact, the trailer was "a good distance from any structures, hundreds of yards from any structure." (Sep. 9, 2008 Tr. Transcript at 46, Dkt. No. 307.) Through a crack in the rubber seal on a corner of the trailer, and with the benefit of a flashlight, Agent Calhoun was able to "see the plastic covering and actually what you could see looked like a container, a jug container." (Id. at 92.) "At that point, [Agent Calhoun] could tell there [were] jugs[, but c]ouldn't tell exactly how many [were] in [the trailer]." (Id. at 45-46.) Agent Calhoun's ability to observe the jugs on March 1, 2006 was apparently impaired because pallets of jugs were flush with the trailer's opening, limiting his field of vision. (Id. at 46 (Agent Calhoun was not able to "tell exactly how high [the jugs] went up or how deep they were at that point," because "the jugs were already backed up all the way against the door"), 48 (because the "jugs [were] right against the back of the doors" and his only being able to look down from his vantage point, Agent Calhoun "could tell they were jugs, but [not] exactly whether this trailer was completely full or not"), 93 (the jugs were "backed up against . . . the opening door").)

On March 9, 2006, Agent Calhoun then returned to Pittsylvania County property, again without a warrant.[10] Approaching the trailer, Agent Calhoun first observed that this time, "there [were] actually pallets, wooden pallets outside the trailer." (Id. at 93.) Because the door opening was no longer blocked, Agent Calhoun was able to more fully observe the inside of the trailer. (Id. at 93-94.) In addition:

---

[10] The parties both refer to February 15, 2006 as Agent Calhoun's first observation of the trailer and March 1, 2006 as the second. After a review of the trial testimony, the court believes that for purposes of Agent Calhoun's up-close observations (which are at issue), this timeline is incorrect. It appears that February 15, 2006 was the first time that Agent Calhoun noticed the trailer while "riding down the road on the adjoining road." (See Sep. 9, 2008 Tr. Transcript at 45, Dkt. No. 307 (the court notes that the transcript records this date as "March 15th," which must be in error).) Agent Calhoun then returned on March 1, 2006, and conducted his first up-close observation of the trailer. (See id. at 45, 49, 93-94.) On March 9, Agent Calhoun then returned to the trailer again. (See id. at 94 ("March 1 was actually the first time, and March 9th" was the second observation of the trailer).)

18

> this time, brought, I call it a carpenter's scope, but it's kind of got a long tube on it with a monocular, just one eye piece, and it kind of uses—it's probably about two feet long and I could stick it through the crack where I could see in the . . . back of the trailer and that's where I could see it was a tremendous amount of jugs there.

(Id. at 92-93.)  With this "carpenter's scope," Calhoun "gained enhanced [viewing] ability . . . that [he] didn't have with just the flashlight."  (Id. at 95.)

Jody Smith argues that law enforcement's entry onto his land on these two occasions, and observations of the locked trailer located therein, constituted violations of the Fourth Amendment.[11]  Jody claims that no exception to the warrant requirement applies to the conduct described above and, in particular, that the confirmed discovery of jugs on March 9, 2006 was critical in moving the government's investigation forward.  Jody argues that these warrantless searches require dismissal of all the moonshine, money laundering, and social security disability fraud counts, or at least a new trial absent the tainted evidence.[12]

The court finds that the government's conduct in this case complies with the Fourth

---

[11] The Fourth Amendment reads:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

[12] Jody Smith also argues that a Kastigar v. United States, 406 U.S. 441 (1972) type hearing is necessary to determine the independent source of evidence not derived from illegal searches before prosecution moves forward on the remaining Counts 31 (obstruction of justice) and 32 (witness tampering).  As the court finds that entry onto the land did not violate the Fourth Amendment under the open fields doctrine, and that the observations of the trailer were likewise constitutional, this request is denied.

Case 7:07-cr-00079-JCT   Document 338   Filed 04/27/09   Page 19 of 29   Pageid#: 2657

Amendment.[13] Under the "open fields" doctrine, Agent Calhoun's entrance onto Jody Smith's property in Pittsylvania County did not constitute a Fourth Amendment search. See Oliver v. United States, 466 U.S. 170, 177 (1984) ("We conclude . . . that the government's intrusion upon the open fields is not one of those 'unreasonable searches' proscribed by the text of the Fourth Amendment."). Thus, despite Jody Smith's property interest in the field, and regardless of how the land may have been posted for trespassers, Agent Calhoun's presence on the land itself did not violate the Fourth Amendment.

Though Agent Calhoun's entry onto the Pittsylvania County property was not a Fourth Amendment violation, the court does find that Jody Smith had a reasonable expectation of privacy in the locked trailer located on that land. See United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993) (affirming district court's finding that a defendant had a reasonable expectation of privacy in a barn located on an "open field").[14] However, Agent Calhoun's limited observation of the trailer's interior on March 1, 2006 was not a "search" under the Fourth Amendment, as he did not physically enter the locked trailer but merely peered inside the trailer with the aid of a flashlight. See Wright, 991 F.2d at 1186 (although defendant had a reasonable expectation of privacy in the barn, an officer could still "stand outside and peer into the barn

---

[13] The court finds that Jody Smith has standing to challenge Agent Calhoun's observations of the trailer. In support of his post-trial motions, Jody Smith submitted an affidavit claiming ownership of "the Pittsylvania County land and property on it," as well as the deed to the land. (Attachs. to Dkt. No. 234.) Further, at the April 7, 2009 hearing, defense counsel represented that the trailer was formally owned by Smith's Auto Sales (Jody Smith's business).

[14] The court disagrees with the government's contention that United States v. Ramapuram, 632 F.2d 1149 (4th Cir. 1982) applies to the facts before it. In Ramapuram, the Fourth Circuit found that a defendant did not have a reasonable expectation of privacy in the trunk of an old, non-functioning automobile (repeatedly referred to as the "junker"), which was located on an open field. 632 F.2d at 1155-56. Critical to the Fourth Circuit's determination was that the trunk itself was not secured, as "the lock assembly had been earlier removed." Id. at 1156. In stark contrast, Jody Smith's trailer was "closed and locked." (Sep. 9, 2008 Tr. Transcript at 93.)

through an open window or door" without a search warrant); <u>United States v. Dunn</u>, 480 U.S. 294, 304 (1987) (use of a flashlight to observe barn located on an open field "did not transform [officers'] observations into an unreasonable search within the meaning of the Fourth Amendment").

As for the second observation of the trailer on March 9, 2006, the court finds that this was a Fourth Amendment search. The "carpenter's scope" was inserted into the locked trailer. It did more than illuminate; it made visible inside the trailer what could not be observed from the outside the trailer with the naked eye by physically breaching the trailer's walls. <u>See Wright</u>, 991 F.2d at 1186 (while an officer could peer through a barn's window or door, the defendant's "reasonable expectation of privacy meant that the officer could <u>not</u> <u>enter</u> the barn without the benefit of a search warrant.") (emphasis added). Contrary to the government's argument, this intrusion goes far beyond mere use of a flashlight or binoculars from a location where an officer has a lawful right of access.

Although Agent Calhoun did not secure a warrant prior to this March 9, 2006 search, the court finds that there was no Fourth Amendment violation because of the automobile exception to the warrant requirement. Under the automobile exception, if probable cause exists,[15] then a "readily movable" vehicle can be searched without a warrant. <u>United States v. Brookins</u>, 345 F.3d 231, 235 (4th Cir. 2003). The court finds that based upon Agent Calhoun's first observation of contents of the trailer on March 1, 2006, the pallets located outside the trailer on March 9, 2006 (which indicated that some contents of the trailer had been removed), and the totality of the government's investigation into the moonshine operation as of that date (including having

---

[15] The Supreme Court has described probable cause "as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996) (citations omitted).

Case 7:07-cr-00079-JCT   Document 338   Filed 04/27/09   Page 21 of 29   Pageid#: 2659

already found the Halifax still site), probable cause existed on March 9, 2006 for Agent Calhoun to believe that the trailer contained evidence of a crime. The court also finds that the trailer was a "readily movable" vehicle. Though a tractor was not found nearby, nothing prevented the trailer from being driven away at any moment. In fact, a current DMV inspection sticker "had just been placed on" the trailer.[16] (Sep. 9, 2008 Tr. Transcript at 49). Under these circumstances, the court believes that the automobile exception to the warrant exception rightly applies.[17]

For the reasons stated above, the court finds that there was no Fourth Amendment violation for the government's entry onto the Pittsylvania County property and observations of the locked trailer found within. Therefore, the court will deny Jody Smith's motions for judgment of acquittal and for a new trial based upon these claimed Fourth Amendment violations.

### B. Perjury—Fifth Amendment

Jody Smith sought to have his perjury count (Count 29) dismissed in a pre-trial motion (Dkt. No. 165), a motion that the court denied on September 5, 2008. (See Sep. 5, 2008 Minutes, Dkt. No. 168). He now asks the court to enter judgment of acquittal for his perjury conviction, putting forth the same argument that the court already rejected.[18] The court will again deny the

---

[16] The inspection sticker was current through February 2007, just under a year out from the March 2006 observations. (Sep. 9, 2008 Tr. Transcript at 49.)

[17] Even if the March 9, 2006 trailer search violated the Fourth Amendment, the court finds that its impact on the convictions of Jody Smith was de minimis. Authorities located the Halifax property in late February 2006, and first set up video surveillance on March 3, 2006. (See Sep. 9, 2008 Tr. Transcript at 15, 28.) As part of the search of the Halifax property on May 12, 2006, the government also seized crates of the same type of gallon jugs found in Pittsylvania County. (See Sep. 8, 2008 Tr. Transcript at 145-47, Dkt. No. 303.)

[18] Though Jody Smith specifically asks for dismissal of Count 29 (see Dkt. No. 234), the court will construe this post-trial motion as seeking judgment of acquittal.

22

motion.

First, when testifying before the grand jury on July 26, 2007, Jody Smith never gave a clear invocation of his Fifth Amendment right to remain silent. He merely stated that his attorney "told me just come in here and plead the Fifth, because you asked me stuff I can't remember." (Gov. Opp. Br. at 19 (quoting grand jury testimony).) At this point, counsel for the United States then prudently re-explained to Jody Smith his Fifth Amendment rights. (Id.)

Second, even if Jody Smith had properly invoked the Fifth Amendment at that time (the only point that it was mentioned during his grand jury testimony), he would still have to assert this right as to each line of questioning by the government. Jody Smith here confuses the critical distinction between custodial interrogation (where one can make a blanket assertion of the privilege against self-incrimination) and testimony before a grand jury (where a witness must repeatedly assert the Fifth Amendment privilege). See United States v. Mandujano, 425 U.S. 564, 579-81 (1976) ("[M]any official investigations, such as grand jury questioning, take place in a setting wholly different from custodial police interrogation. . . .when [a] grand jury witness asserts the [Fifth Amendment] privilege, questioning need not cease, except as to the particular subject to which the privilege has been addressed."); In re Matter of Grand Jury Subpoena, 739 F.2d 1354, 1359 (8th Cir. 1984) (a grand jury witness may not "claim the [Fifth Amendment] privilege as a blanket defense. Rather, the witness must make specific objections in response to specific questions.") (citation omitted). Jody Smith mentioned the Fifth Amendment on page 26 of the grand jury transcript, in response to a question about the rental arrangements for some of his properties. However, the statements for which Jody Smith was convicted of perjury occurred much later (on page 50 of the grand jury transcript), and concerned whether he had ever seen an operating moonshine still on the Halifax property or if he was ever involved in such an operation

at the Halifax property. (See Gov. Opp. Br. at 19-20; Indictment at 17.) Even if Smith had earlier invoked the Fifth Amendment privilege, he would have had to restate it in response to the new questions about the illegal moonshine still at the Halifax property. Unquestionably, this did not occur.

For these reasons, the court will deny Jody Smith's motion for judgment of acquittal as to Count 29.

### C. Tape-Recorded Conversation—Sixth Amendment

On November 19, 2007, Jody Smith and other co-defendants traveled together by car from Rocky Mount to Roanoke for arraignment on the original indictment. According to co-defendant Jarman Johnson's testimony, this car ride was arranged by Jody Smith. (See Sep. 10, 2008 Tr. Transcript at 147, Dkt. No. 304.) Before and after this trip, Jody Smith was represented by counsel, a fact known to the Assistant United States Attorney. Therefore, Jody Smith contends that the government's use of Johnson to secretly to tape-record the car ride conversation between himself, Johnson, and other co-defendants violated his Sixth Amendment right to counsel.[19] As a result, Jody Smith claims that a new trial should be ordered for all of his convictions, and that yet to be tried Counts 31 (obstruction) and 32 (witness tampering) should be dismissed with prejudice.[20]

In support, Jody Smith principally relies on Massiah v. United States, 377 U.S. 201 (1964). The court finds that Massiah and its progeny do govern this issue, but that Johnson's

---

[19] In a passing reference, Jody Smith also states that the tape-recording violates his Fifth Amendment right to silence. The court finds no basis for this claim.

[20] In his pre-trial filings, Jody Smith previously moved to have these counts dismissed, and also to have the tape-recording itself suppressed. (See Dkt. No. 169.) The court denied the motion to dismiss and severed Counts 31 and 32 from the trial. (See Sep. 8, 2008 Minutes, Dkt. No. 184.) The court later denied all motions to suppress the tape-recording. (See Sep. 10, 2008 Criminal Minutes, Dkt. No. 196.)

conduct (and by extension the government's) complied with the Supreme Court's guidance:

> a defendant does not make out a violation of [his Sixth Amendment] right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was <u>designed deliberately to elicit incriminating remarks</u>.

<u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 459 (1986) (emphasis added).

Here, a thorough review of the transcript (Gov. Tr. Ex. 102 & Ex. G to Gov. Opp. Br.) reveals that Johnson's participation in the conversation with Jody Smith was proper.[21] Smith did the vast majority of the talking. Johnson was not obligated to remain absolutely mute during the car ride, which would be almost certain to raise Smith's suspicions. Johnson's statements were not made to elicit incriminating statements from Jody Smith, but were in response to questions or statements by Jody Smith or others, and consist almost entirely of short statements of affirmance. See <u>Matteo v. Superintendent, SCI Albion</u>, 171 F.3d 877, 896 (3rd Cir. 1999) (in similar circumstances, approving participation where the informant "responded almost exclusively with monosyllabic rejoinders such as 'okay,' 'yeah,' 'uh-huh,' and the like" and where the informant also asked "a few clarifying questions directly responsive to statements [the defendant] had just made"). In short, Johnson's conduct falls far short of taking action "designed deliberately to elicit incriminating remarks" from Jody Smith.[22]

For these reasons, the court denies Jody Smith's motion for a new trial based upon the

---

[21] Because the court finds that the government's indirect contact with Jody Smith was "authorized by law," there was no violation of Virginia Rule of Professional Conduct 4.2.

[22] Jody Smith misrepresents the court's rulings when stating that the court "reversed" its ruling on the suppression issue. The court deferred ruling on whether the tape would be received in evidence, and defense counsel knew that its eventual submission was a possibility. The court also finds that Jody Smith was not unfairly prejudiced by the court's decision to admit the tape-recording and its transcript into evidence.

25

alleged Sixth Amendment violation, as well as Jody Smith's attempt to yet again have Counts 31 and 32 dismissed.

### D. Social Security Fraud

Jody Smith contends that the evidence was insufficient to support his conviction for social security disability fraud (Count 12). Specifically, Jody Smith argues that there was no proof that he was actually told of his reporting obligation to the Social Security Administration should his financial circumstances change. To the contrary, the evidence at trial established that Jody Smith was repeatedly told that he must report any changes in his financial circumstances. Further, there was more than sufficient evidence that Jody Smith in fact defrauded the government by continuing to receive his disability payments after commencing the illegal moonshine business.

For these reasons, the court will deny Jody Smith's motion for judgment of acquittal and motion for new trial as to Count 12.

### E. Money Laundering

Jody Smith was convicted of conspiring to launder money (Count 13) as well as 15 individual violations of the money laundering statute (Counts 14-28). The individual violations are purchasing sugar (Count 14), purchasing security cameras (Count 15), transferring title to the Halifax property from co-defendant Danny Davis to Margaret Smith (Count 16), purchasing jugs (Count 17), and payments towards the Halifax property mortgage (Counts 18-28).

Unless separately set forth below, the court's analysis with respect to the money laundering convictions of Margaret Smith also applies to Jody Smith. (See supra Part III(B).) Additionally, the court finds that like the mortgage payments on the Halifax property, purchase of the sugar, jugs, and security cameras constitute "essential expenses" of operating the illegal

moonshine business. To the extent that the substantive money laundering convictions rest upon using moonshine proceeds to simply pay the essential expenses involved with operating that illegal business (Counts 14-15, 17-28), Jody Smith's convictions cannot be sustained under Santos.[23]

However, the analysis with respect to Jody Smith is complicated by the government's argument that because it charged that the 18 U.S.C. § 1956(a)(1) "proceeds of specified unlawful activity" could be either from the moonshine operation or from Jody Smith's fraudulent receipt of social security disability payments, his money laundering convictions should still stand even under Stevens' "essential expense" analysis. (Gov. Opp. at 38.)[24]  Stated differently, the government argues that there is no "merger problem" or "perverse result" under Santos if the jury found that the "proceeds" from one "specified unlawful activity" (social security disability fraud) were used to "promote" or "conceal and disguise" a different "specified unlawful activity" (moonshining).

The court finds this argument unavailing because under the government's theory, the statutorily defined term "specified unlawful activity" would have multiple and shifting meanings for each of Jody Smith's money laundering convictions. According to the Indictment, for purposes of 18 U.S.C. § 1956(a)(1), "specified unlawful activity" means "(1) proceeds [from the illegal moonshine operation] and (2) proceeds from the receipt of fraudulent [social security disability benefits])." (Indictment at 14-15). Then, for purposes of the "promotion" (18 U.S.C. § 1956(a)(1)(A)) or "conceal and disguise" (18 U.S.C. § 1956(a)(1)(B)(i)) prongs of the statute, the "specified unlawful activity" changes to solely the illegal moonshine operation. (See id. at

---

[23] Count 16 against Jody Smith must also be vacated for the reasons expressed supra Part III(B).

[24] Unlike Margaret Smith, the court finds that Jody Smith knew that he had obtained fraudulent social security disability payments.

Case 7:07-cr-00079-JCT   Document 338   Filed 04/27/09   Page 27 of 29   Pageid#: 2665

15).  Though a number of statutorily defined predicate crimes may constitute a "specified unlawful activity" that term must be used singularly and consistently for each money laundering conviction.  See Singh, 518 F.3d at 246 ("In order to secure a conviction on a promotion money laundering charge, the prosecution is obliged to prove four elements beyond a reasonable doubt: . . . (2) the transaction involved the proceeds of a specified unlawful activity . . . and (4) the defendant intended to promote the carrying on of the specified unlawful activity.") (emphasis added) (citation omitted); Medina, 485 F.3d at 1300 ("For [the money laundering] counts to succeed, the government must prove that the proceeds were derived from a specified unlawful activity, and that the defendant had knowledge that the proceeds resulted from said unlawful activity.") (emphasis added).  In addition, the court finds criminalizing use of money from one illegal source to "promote" or "conceal and disguise" a distinct illegal enterprise does not comport with the purpose of the money laundering statute.[25]

Pursuant to Fed. R. Crim. P. 29(d)(1), the court also conditionally grants Jody Smith's motion for a new trial on the money laundering counts.  First, as explained supra, the court finds that Count 16 fails as a matter of law.  Second, in light of Santos, the court finds that the money laundering jury instructions were prejudicial.  The jury should have been instructed that the revenue generated by a specified unlawful activity used in a financial transaction to pay the essential expenses of operating that same illegal business cannot constitute "proceeds" under the

---

[25] Unlike Margaret Smith, the court finds that there was sufficient evidence that Jody Smith received proceeds from the illegal moonshine operation.  Jody Smith was observed on surveillance footage on the Halifax property, he was the contact person for customer John Taylor, and testimony from Jarman Johnson as well as other evidence introduced by the government indicated that Jody Smith was the leader of the moonshine operation.  As for receiving proceeds from the illegal social security disability payments, the court has already found that there was sufficient evidence to support Jody Smith's conviction for this crime.  Therefore, the court declines to, in the alternative, overturn Jody Smith's money laundering convictions pursuant to United States v. Baker, 985 F.2d 1248, 1254 (4th Cir. 1993).

28

money laundering statute.

For the reasons stated, the court will grant Jody Smith's motion for judgment of acquittal as to Counts 13-28, and conditionally grants his motion for a new trial on these same counts.

## V. Conclusion

For the reasons stated above, defendants' post-trial motions will be **GRANTED** in part and **DENIED** in part. The court will **GRANT** Margaret Smith's motion for judgment of acquittal (Dkt. No. 229) as to Counts 13, 16, 19, and 22-28; conditionally **GRANT** Margaret Smith's motion for a new trial (Dkt. No. 228) as to Counts 13, 16, 19, and 22-28; and **DENY** Margaret Smith's motions in all other respects. The court will **GRANT** Jody Smith's motion for judgment of acquittal (Dkt. No. 234) as to Counts 13-28; conditionally **GRANT** Jody Smith's motion for a new trial (Dkt. No. 234) as to Counts 13-28; and **DENY** Jody Smith's motions in all other respects. An appropriate order shall issue this day.

The Clerk is directed to send a copy of this memorandum opinion and the accompanying order to all counsel of record.

**ENTER:** This _27th_ day of April, 2009

Senior United States District Judge

29